IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

RESER'S FINE FOODS, INC.,

Plaintiff,

v.                                                              No. 16-4150-SAC

H.C. SCHMIEDING PRODUCE CO., LLC.,
and C & E FARMS, INC.,

Defendants.
_____

H.C. SCHMIEDING PRODUCE CO., LLC.,

Third-party Plaintiff,

v.

RESER'S FINE FOODS, INC.,
SUNTERRA PRODUCE TRADERS, INC.,
and C.H. ROBINSON WORLDWIDE, INC.,

Third-party Defendants.


MEMORANDUM AND ORDER

This case comes before the court on the motion of H.C.

Schmieding Produce Co., LLC ("Schmieding") for summary judgment (ECF#

75) against the plaintiff Reser's Fine Foods, Inc. ("Reser's"). The parties

have filed their respective memoranda, and the movant asks for oral

argument. The court does not find oral argument necessary here. The

parties have fully briefed the issues, and oral argument would not materially

assist the court in deciding the merits of the pending motion.

**BACKGROUND OF ALLEGATIONS**

In September of 2016, Reser's filed this declaratory judgment action asking for an offset of $269,519.87, as the alleged damages from Schmieding's breach of contract in supplying a load of celery that Reser's had used in its finished food products and was notified later that the celery was the subject of a recall and then a hold. ECF# 1. Reser's had contracted with Schmieding on or about February 19, 2015, for the purchase of 91 truckloads of celery to be delivered between February of 2015 and January of 2016 ("2015 Celery Contract").

Reser's alleges the load of celery in dispute was delivered on November 11, 2015, pursuant to invoice #133505[1] and contained long stalk celery, bulk from LUNDY 10b-2. Reser's alleges that by the time Schmieding verbally notified it of the hold being lifted, Reser's had already disposed of the finished product and was in the process of replacing the product due for delivery to its customers. Reser's alleges it "has withheld $269,519.87 from Defendant Schmieding, as an offset to amounts otherwise due Defendant Schmieding for celery delivered to Plaintiff during 2015." ECF# 1, ¶ 32. Reser's demands a declaratory judgment that it is entitled to retain this offset as damages and that the defendants are barred from asserting any "further claims by reason of celery Defendants supplied and delivered to

---

[1] This is the number appearing on Schmieding's invoice that corresponds with the purchase order #838903 for celery purchased and billed to Reser's for delivery on November 11, 2015. ECF# 76-9, p. 19.

Plaintiff in November, 2015, and under the 2015 Celery Contract." ECF# 1, p. 6.

Schmieding alleges that pursuant to an asset purchase agreement it acquired all rights and assumed all obligations under the 2015 Celery Contract. ECF# 62 pp. 7-8. This celery contract obligated Reser's to purchase six loads of celery in November of 2015, but Reser's asked Schmieding to locate on the open market a seventh load of celery and sell it to Reser's on the issued purchase order #838903. Schmieding did this and entered into an agreement for the sale and purchase of the celery described in the purchase order. Schmieding delivered this load to Reser's on November 11, 2015, which is the subject of invoice #133505. Over Schmieding's repeated demands, Reser's has failed to pay for the loads of celery delivered between October 12, 2015 and February 22, 2016, and Reser's presently owes Schmieding the amount of $276,519.87. On these allegations, Schmieding asserts four counterclaims against Reser's for:  1) failure to pay trust funds in violation of the Perishable Agricultural Commodities Act, 7 U.S.C. §§ 499a, *et seq.* ("PACA"); 2) failure to make prompt and full payment for shipments in violation of PACA; 3) breach of contract and invoices in not timely remitting payment; and 4) recovery of interest and attorney's fees. ECF# 62, pp. 11-13.

## SUMMARY JUDGMENT STANDARDS

Rule 56 mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. This does not mean that the moving party must negate the other sides' claims or defenses through affidavits. *Id.* Upon a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings, that is, mere allegations or denials, and set forth specific facts showing a genuine issue of material fact for trial, relying upon the types of evidentiary materials contemplated by Rule 56. *Id.*

The court decides the motion "through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). Thus, a factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Id.* at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position. Id. at 252. The purpose of Rule 56 "is not to replace

conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). At the summary judgment stage, the court is not to be weighing evidence, crediting some over other, or determining the truth of disputed matters, but only deciding if a genuine issue for trial exists. *Tolan v. Cotton*, ---U.S.---, 134 S. Ct. 1861, 1866 (2014). The court performs this task with a view of the evidence that favors most the party opposing summary judgment. *Id*. Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Liberty Lobby*, 477 U.S. at 250–51. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52.

**SUMMARY OF POSITIONS AND SUBSTANTIVE LAW**

Schmieding seeks "summary judgment against Reser's on each of its causes of action." ECF# 76, p. 10. It asks the court to enter judgment against Reser's in the principal amount of $276,862.39, plus interest at the rate of 18% per annum accrued through the date of judgment, and attorney's fees actually incurred in the amount of $62,149.94.

Schmieding's first counterclaim addresses PACA's statutory trust liability. The court's prior order laid out the following as relevant to this claim:

> The Perishable Agriculture Commodities Act, which was enacted
> in 1930 to suppress unfair and fraudulent business practices in the

marketing of perishable commodities, was amended in 1984 to provide unique credit protection to sellers of perishable agricultural commodities. Because sellers of perishable commodities had a need to move their inventories quickly, they were often required to become unsecured creditors of their purchasers, whose credit they were often unable to verify. . . .

The 1984 amendments create, upon the sale of perishable agricultural commodities, a trust for the benefit of the unpaid sellers of the commodities on (1) the commodities, (2) the inventory or products derived from them, and (3) the proceeds of the inventory or products. 7 U.S.C. § 499e(c)(1)-(2); *see also* House Report at 3 (recounting congressional findings); *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 413 (5th Cir.2003) (same). As amended, PACA requires that purchasers of perishable agricultural commodities maintain the trust by retaining the commodities or their proceeds until the commodities sellers are paid, and it makes it unlawful to "fail to maintain the trust as required." 7 U.S.C. § 499b(4). PACA confers jurisdiction on district courts to entertain "actions by trust beneficiaries to enforce payment from the trust." *Id.* § 499e(c)(5).

The trust created by PACA is a "nonsegregated 'floating' trust" on perishable agricultural commodities and their derivatives until all sellers of such commodities are paid. 7 C.F.R. § 46.46(b). Because the governing regulations specifically contemplate the commingling of trust assets without defeating the trust, *see id.*, the trustee of such a trust is permitted to convert trust assets into other property, provided that the trustee honors its obligation to "maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities," *id.* § 46.46(d)(1). Any act inconsistent with maintaining the trust, including "dissipation" of trust assets, is deemed unlawful and a violation of PACA. *See* 7 U.S.C. § 499b; 7 C.F.R. § 46.46(d)(1). "Dissipation" is defined as "any act or failure to act which could result in the diversion of trust assets or which could prejudice or impair the ability of unpaid suppliers, sellers, or agents to recover money owed in connection with produce transactions." 7 C.F.R. § 46.46(a)(2).

ECF# 42, pp. 11-12 (quoting *Nickey Gregory Co., LLC v. Agricap, LLC*, 597 F.3d 591, 594-95 (4th Cir. 2010)). The court's prior order also summarized that a commodities purchaser violates PACA by failing to retain in trust the commodities or their proceeds until the commodities seller is paid. *Id.* at p.

12. This trust is a "nonsegretated floating trust" in which the commodities and their proceeds can be commingled or converted into other assets so long as the trust assets are maintained to be "freely available to satisfy outstanding obligations" to the commodities sellers. *Id.* Acting or failing to act with respect to the trust assets violates PACA if the assets are not maintained to be freely available to satisfy obligations but are diverted or if the unpaid sellers' recovery of the owed money is prejudiced by the dissipation of assets.

Besides the trustee's duty to maintain and ensure sufficient assets, courts have recognized that as a PACA trustee, "a produce buyer is charged with a duty 'to ensure . . . . that any beneficiary under the trust will receive full payment.'" *Coosemans Specialties, Inc. v. Gargiulo*, 485 F.3d 701, 705 (2nd Cir. 2007) (quoting *D.M. Rothman & Co. v. Korea Commercial Bank of N.Y.*, 411 F.3d 90, 94 (2d Cir.2005)). This is because:

> The buyer has a "fiduciary obligation under PACA to repay the full amount of the debt owed to the PACA beneficiary." *C.H. Robinson Co. v. Alanco Corp.*, 239 F.3d 483, 488 (2d Cir.2001). Under the statute, the trust is formed at the moment the buyer receives the produce and remains in effect until the seller is paid in full. See 7 C.F.R. § 46.46(c)(1); *In re Kornblum & Co.*, 81 F.3d 280, 286 (2d Cir.1996). However, to establish the existence of a PACA trust, a number of prerequisites must be met:
>
>> [T]he seller must demonstrate that: (1) the commodities sold were perishable agricultural commodities; (2) the purchaser of the perishable agricultural commodities was a commission merchant, dealer or broker; (3) the transaction occurred in interstate or foreign commerce; (4) the seller has not received full payment on the transaction; and (5) the seller preserved its trust rights by giving written notice to the purchaser of its intention to do so.

> *Taylor & Fulton* [*Packing, LLC v. Marco Intern. Foods, LLC,*] 2011 WL 6329194, at *5 [(E.D.N.Y. 2011)](citations omitted).

*Dell's Maraschino Cherries Co., Inc. v. Shoreline Fruit Growers, Inc.*, 887 F. Supp. 2d 459, 477 (E.D.N.Y. 2012); *see Tom Ver LLC v. Organic Alliance, Inc,* 2015 WL 6957483 at *8 (N.D. Cal. Nov. 11, 2015). In sum, Schmieding's first counterclaim addresses the additional remedy of a statutory trust as expressed in the fifth element stated above, but Schmieding's second PACA counterclaim addresses the trustee's/buyer's failure to make prompt payment as expressed in the first four elements:

> "Under PACA, it is unlawful for buyers of produce, inter alia, to fail to make prompt payment for a shipment of produce." *Id.* [*Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 199 (3d Cir. 1998)] (citing 7 U.S.C. § 499b(4)). A buyer's failure to tender prompt payment triggers civil liability and the possible suspension or revocation of the buyer's PACA license that 7 U.S.C. § 499c requires. *See* 7 U.S.C. § 499h(a). The PACA regulations define the time for prompt payment, which applies unless the parties agree otherwise in writing to different payment provisions prior to the transaction. *See* 7 C.F.R. § 46.2(aa).

*Pacific Intern. Marketing, Inc. v. A & B Produce, Inc.*, 462 F.3d 279, 282 (3d Cir. 2006). Schmieding's second PACA counterclaim seems to be articulated within the first four elements expressed above.

The parties' memoranda show there is no dispute over the first three elements (perishable commodity, licensed purchaser and interstate commerce transaction). As to the fourth element, seller's receipt of full payment on the transaction, it is uncontroverted that between October 12, 2015 and February 22, 2016, Schmieding sold and delivered to Reser's in interstate commerce 25 truckloads of celery worth $276,519.87, that

Schmieding timely invoiced Reser's for all of these loads, and that Reser's has withheld payment on all 25 loads asserting a setoff to recover its costs and losses resulting from its use of the celery delivered pursuant to invoice #133505. With respect to this fourth element, the parties dispute the legal propriety of Reser's use of a setoff remedy pursuant to custom and practice as governed by the Uniform Commercial Code provisions. As to the fifth element, seller's written notice preserving trust rights, it is uncontroverted that each of the 25 invoices included the necessary statutory trust language required by 7 U.S.C. § 499e(c)(4). For both of these counterclaims, Schmieding is asserting the same actionable wrong by the buyer or trustee in failing to make timely payment. Reser's arguments of having maintained adequate liquid assets for the trust and of having no proceeds from the one load of celery does not address it's alternative liability for failure to pay for all 25 loads of celery.

On its third counterclaim, Schmieding alleges the 2015 Celery Contract and the invoices are valid and enforceable contracts which Reser's breached by failing to make timely payment for the delivered celery. The parties do not address whether this claim is subject to Arkansas or Kansas law. The 2015 Celery Contract includes the following provision: "The contract shall have been deemed to have been made in Washington County, Arkansas and shall be governed by Arkansas law." ECF# 76-8, p. 3. For the elements of proof on its breach of contract action, Schmieding cites a federal

district court opinion applying Kansas law. ECF# 76, p. 19 (citing *Britvic Soft Drinks, Ltd v. ACSIS Technologies, Inc.*, 265 F. Supp. 2d 1179 (D. Kan. 2003) ("The elements for a breach of contract claim are: (1) the existence of a contract between the parties; (2) consideration; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) defendant's breach of the contract; and (5) that plaintiff was damaged by the breach." (citation omitted)). Schmieding's apparent position is that Kansas law would govern its breach of contract claim arising out of its sale and delivery of the additional celery allegedly not covered by the 2015 Celery Contract. As for the claims of breaching the 2015 Celery Contract, the parties agree that Arkansas law governs. *See Keith Capps Landscaping & Excavation, Inc. v. Van Horn Const., Inc.*, 2014 Ark App. 638, 448 S.W.3d 207, 210 (2014) ("In order to prove a breach-of-contract claim, one must prove the existence of an agreement, breach of the agreement, and resulting damage." (internal quotation marks and citation omitted)). As with the first two counterclaims, what Schmieding is asserting as the actionable wrong or breach here is the failure to pay for the 25 loads, and the dispute concerns Reser's use of a setoff remedy.

**RESER'S USE OF SETOFFS TO OFFSET ITS COSTS AND LOSSES**

Relying on the affidavit of its Chief Financial Officer ("CFO") Paul Leavy, Reser's position is that, "[a]s of November, 2015, it was the custom and practice between Reser's and Schmieding for Reser's to use setoffs on

future Schmieding invoices to offset costs and losses Reser's incurred due to problems with products received from Schmieding." ECF## 87, pp. 19-20; 87-2, p. 6. CFO Levy avers that based on Reser's costs and losses incurred from the recall and hold on the invoiced celery load #133505, Reser's followed this custom and practice by not paying Schmieding's celery invoices dated from October 27, 2015, through March 11, 2016. *Id.* Finally, Reser's acknowledges that the 2015 Celery Contract is governed by Arkansas law, that the contract contains no setoff terms, and that "Schmieding correctly argues that, as the contract is one for a sale of goods between merchants, the Uniform Commercial Code applies and any right to setoff must arise out of the UCC." ECF# 87, p. 20.[2] Thus, Reser's rights to a setoff against the 2015 Celery Contract are governed by the following UCC provision: "The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract." Ark. Code Ann. § 4-2-717. "Because § 2-717 authorizes a buyer to deduct damages resulting from the

---

[2] "A claim to equitable setoff is preempted by U.C.C. § 2-717. Because the U.C.C. specifically provides for setoffs in particular circumstances, the Code drafters and the state legislatures that have adopted the Code intended to displace common-law setoff." Lawrence's Anderson on UCC § 2-717:4 (3d. ed.) (citing *AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 951 (9th Cir. 2006) (which cites *Carlisle Corp. v. Uresco Const. Materials, Inc.*, 823 F. Supp. 271, 275 (M.D. Pa. 1993) ("Because of that, we must conclude that the Code drafters, and the state legislatures that have adopted the Code, meant to displace the common law set-off. *See Microsize, Inc. v. Arkansas Microfilm, Inc.*, 29 Ark. App. 49, 55, 780 S.W.2d 574, 578 (1989).")).

seller's breach, the buyer does not breach the parties' contract when it properly deducts these damages." *Tegrant Alloyd Brands, Inc. v. The Merchant of Tennis, Inc.*, 2011 WL 249469, at *6 (N.D. Ill. Jan. 26, 2011). If there remains a genuine factual issue over Reser's proper use of the set-off remedy, then summary judgment must be denied as to Schmieding's claims that Reser's violated PACA and breached the 2015 Celery Contract by failing to make the required invoice payments. *Id.*

Schmieding argues that Reser's position relies on an overbroad application of 2-717. This provision "'is not a general set-off provision permitting a buyer of goods to adjust its continuing contract obligations according to the equities perceived by the buyer.'" *ITV Direct, Inc. v. Healthy Solutions, LLC*, 379 F. Supp. 2d 130, 133 (D. Mass. 2005) (quoting *C.R. Bard, Inc. v. Med. Elecs. Corp.*, 529 F. Supp. 1382, 1387 (D. Mass. 1982)), *aff'd*, 445 F.3d 66 (1st Cir. 2006). Schmieding contends Reser's failed to provide the required notice to Schmieding of its "intention" to deduct or offset its costs or losses. According to Schmieding, Reser's only relevant communication makes no mention of deducting or offsetting losses from amounts due under the 2015 Celery Contract. Even assuming timely adequate notice, Schmieding argues invoice #133505 is a separate transaction not covered by the 2015 Celery Contract and, "therefore Reser's cannot withhold every penny due Schmieding based on damages allegedly

incurred in connection with the goods it received only under the Purchase

Order, the value of which was only $15,490.40." ECF# 76, p. 18.

<u>Notice of Intention to Deduct</u>

It is uncontroverted that Reser's sent Schmieding a letter dated

December 2, 2015, that listed the kinds of costs incurred as a result of the

recall and hold order placed on the invoiced load #133505. This letter

concluded with the following:

> For all of the above reasons, there may be causes of action and claims against all parties in the supply chain to Reser's Fine Foods, Inc. Costs are being accumulated and tracked by our accounting department. We will be in contact with you to discuss the result of their review and the impending consequences of the hold order. Please let me know when you and/or the appropriate representative(s) from H.C. Schmieding would be available for a conference call.

ECF# 76-11, p. 2. Then on December 22, 2015, a Reser's representative

sent to a Schmieding representative an email stating that, "attached is a

copy of the credit for the celery issue. I will call to discuss." ECF# 87-14.

The official UCC comment on the notice requirement of 2-717

reads:

> The buyer, however, must give notice of his intention to withhold all or part of the price if he wishes to avoid a default within the meaning of the section on insecurity and right to assurances. In conformity with the general policies of this Article, no formality of notice is required and any language which reasonably indicates the buyer's reason for holding up his payment is sufficient.

Ark. Code Ann. § 4-2-717. The Arkansas Supreme Court calls this "a

sensible requirement, for the seller should be apprised of the buyer's

intentions in withholding the price." *Jones v. Atkins*, 254 Ark. 472, 477, 494

S.W.2d 448, 451 (1973). Because there is no required formality with this notice, it can be done through telephone conversations, meetings, letters and other communications. *Sencon Systems, Inc. v. W.R. Bonsal Co.*, 1986 WL 10989 at *3 (N.D. Ill. Sept. 29, 1986). Reser's has come forward with evidence that it used letters, emails and conversations to communicate about its losses and its calculation of the same in arriving at a "credit." A reasonable jury could find that these communications "reasonably indicate" Reser's intention to assert a "credit" against future dealings/payments and its reason for the same. The court is satisfied that there is evidence of a sufficient disagreement over the nature and timing of the notice as to create genuine issues of material fact.

<u>Same Contract</u>

Upon notifying the seller, the buyer "may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract." Ark. Code Ann. § 4-2-717. The official UCC comment emphasizes this same contract requirement, "To bring this provision into application the breach involved must be of the same contract under which the price in question is claimed to have been earned." *Id.* Thus, courts reject setoff defenses based on damages arising from breaches of different contracts. *See, e.g.,AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 950 (9th Cir. 2006)("A plain reading of the statute [§ 2-717] indicates that a party may not set-off a contractual

14

claim against a debt on a separate contract."); *ECHO, Inc. v. Whitson CO., Inc.*, 52 F.3d 702, 705-06, 708 (7th Cir. 1995)(Distributorship agreements are different contracts from the purchase orders that arise under them, because the source of rights related to price, type and quantity of goods arise under the purchase order, not the distributorship agreement. "Each party's rights have their origins in different contracts, and we have determined that such a state of affairs precludes set-off." (citations omitted)); *ITV Direct, Inc. v. Healthy Solutions, LLC*, 379 F. Supp. 2d 130, 133 (D. Mass. 2005)("[I]t is well established that the buyer's obligation to pay for goods tendered and accepted does not arise under the same contract as the alleged breach of an exclusive dealing or distributorship agreement by the seller." (internal quotation marks and citation omitted). The distribution agreement contemplated sales, but the purchase orders controlled the price, type, and quantity of goods.); *GFSI, Inc. v. J-Loong Trading, Ltd.*, 2006 WL 3523782, at *3 (D. Kan. Dec. 6, 2006)("Based on the general terms of the Requirements Manual and absent price or quantity terms and the signatures of the parties, each purchase order (after acceptance by J-Loong) constituted a separate and distinct contract."); 1 Roy Ryden Anderson, Damages Under the Uniform Commercial Code, § 7.3 (2016)("Section 2-717 does not authorize deductions for breaches of separate contracts." (Footnote of supporting citations omitted)); 4A David Frisch, Lawrence's Anderson on the Uniform Commercial Code, § 2-717:18 (2016)("While a buyer has the

right to deduct breach of contract damages from the purchase price of delivered goods, he must show that the breach was under the same contract that obligated payment." (citation omitted)); *c.f. J-B Marketing, Inc. v. Golden County Foods, Inc.*, 2013 WL 12109102, at \*4 (W.D. Wis. Jan. 13, 2013)("If an initial agreement contains only general terms and separate purchase orders or invoices contain the specific terms or relate to different goods, the agreements are more likely to be considered separate contracts under the law." The court recognized a question of fact when the initial agreement included details on price, type and quantity of goods as to show the later purchase orders are related.)

Simply put, "in order for a buyer to invoke § 2-717, the asserted breach must go to the *essence of the transaction* under which the seller seeks to recover his price." *ITV Direct*, 379 F. Supp. 2d at 133 (internal quotation marks and citation omitted). "'The purpose of § 2-717 is to enable business-persons to dispute a particular transaction while carrying on their business otherwise.'" *Rebaque v. Forsythe Racing Inc.*, 134 Ill. App. 3d 778, 480 N.E.2d 1338, 1341 (1985) (quoting *Artmark Associates, Inc. v. Allied Tube & Conduit Corp.*, 32 UCC Reporting Service 454, 456 (N.D. Ill. 1981)). Thus, mindful that UCC provisions are to offer uniformity, these decisions and the prevailing interpretations of 2-717 offer "a rule which furthers the values of certainty and predictability, and is thus consistent with the public interest, *i.e.*, that a seller be entitled to the price of goods accepted,

regardless of the buyer's claim under some remote transaction." *Id*. (citation omitted).

In discussing Arkansas law on 2-717, Reser's cites *Mountain Pure, L.L.C. v. Affiliated Foods Southwest, Inc.*, 96 Ark. App. 346, 241 S.W.3d 774 (2006), and argues that this decision recognizes applying this setoff provision "liberally" in a debt-defense context and that this includes setting off its damages from a contract with Affiliated against amounts due under contracts with other packaging suppliers. The court will not follow *Reser's* reading of *Mountain Pure.* First, the Arkansas Court of Appeals in this decision notes that the Arkansas statute calling for liberal application of remedies was repealed in 2005. 241 S.W.3d at 778 n.4. Second, the Arkansas court discussed using 2-717 to deduct damages caused by vendors against amounts owed to the same vendors under the same contracts. Thus, the court finds nothing in *Mountain Pure* or in any other Arkansas case law to suggest that Arkansas courts would interpret or apply 2-717 in a manner that differs substantially from the prevalent interpretation and application followed by other courts.

Schmieding first contends that for each load of celery delivered under the 2015 Celery Contract, a separate purchase order and invoice was issued thereby making each load a separate or divisible contract. ECF#76, p. 18. Under Arkansas law, "the test for determining whether a contract is entire or severable is the intention of the parties to the contract," and this

intention is learned "from the language used, the subject matter of the contract and circumstances of the particular transaction." *Elder Const. Co. v. Ivey Lane, LLC*, 2010 Ark. App. 10, 370 S.W.3d 861, 864 (2010) (citing *Jones v. Gregg,* 226 Ark. 595, 604-05, 293 S.W.2d 545, 550 (1956)). The court's determination involves applying this rule:

> As a general rule it may be said that a contract is entire when, by its terms, nature, and purpose, it contemplates that each and all of its parts are interdependent and common to one another and to the consideration, and that it is severable when, in its nature and purpose, it is susceptible of division and apportionment. Acts of the parties in treating the contract as entire or severable have an important bearing on its construction.

*Elder Const. Co. v. Ivey Lane, LLC*, 370 S.W.3d at 864 (quoting *Jones*, 226 Ark. at 605). (Ark. App. 2010). The UCC treats installment contracts calling for installment deliveries as generally a single contract rather than separate contracts. *See* Ark. Code Ann. § 4-2-612. The parties' 2015 Celery Contract detailed the number of truckloads to be delivered for a particular year, it scheduled the number of truckloads per month, and it established the price for each truckload based on the month of delivery. The contract laid out the parties' rights and obligations for the sale, delivery and purchase of all 91 truckloads of celery. There is sufficient evidence here that a reasonable jury could find that the parties' intention was for the sale and purchase of all 91 truckloads of celery to be governed by the single 2015 Celery Contract. *See Sencon Systems, Inc.*, 1986 WL 10989 at *2-*3.

Schmieding alternatively argues that even if the 2015 Celery Contract is construed as covering all 91 truckloads of celery regardless of the separate purchase orders and invoices, the invoiced load #133505 delivered on November 11, 2015, is "expressly outside" the 2015 Celery Contract. ECF# 76, p. 18. In short, Schmieding contends that the invoiced load #133505 is not one of the 91 truckloads of celery under the 2015 Celery Contract. It is uncontroverted that the 2015 Celery Contract called for six truckloads of celery in November to be sold and delivered at the price of $26.50. ECF# 76-8, p. 4. Schmieding asserts that the invoiced load #133505 is not one of these six contract loads, that Reser's asked for a seventh load in November, and that #133505 is this seventh load, open-market sale made under a separate contract at a different price. Thus, Schmieding argues that Reser's claimed losses from #133505 are from a different contract. This means that in defending against its liability under PACA law or under common-law breach of contract law, Reser's may not rely on having withheld payments through a setoff of its losses under the #133505 contract against the other celery loads delivered under the separate 2015 Celery Contract.

Reser's argues the "facts belie" Schmieding's position that #133505 is a separate contract from the 2015 Celery Contract. ECF# 87, pp. 27-28. Specifically, Reser's lines itself behind the following points:

> The parties are in agreement that the February 19 Contract of Sale called for delivery of 91 loads of celery during its one-year term . . .

and called for delivery of six loads during November. . . . However, the February 19 Contract of Sale did not specify the dates in November on which the six deliveries would be made, it merely specified that six deliveries would be made during November. . . . The load of celery delivered on November 11, 2015 was the fourth load delivered in November 2015, and the 77th load delivered during the term of the Contract of Sale. . . . Thus, it clearly fell within the six loads to be delivered in November 2015 and the 91 loads to be delivered during the term of the February 19 Contract.

. . . Neither *AmerisourceBergen* [*Corp. v. Dialysist W., Inc.*, 465 F.3d 946 (9th Cir. 2006)] nor *Berdex*[*, Inc. v. Milfico Prepared Foods, Inc.*, 258 Ill. App. 3d 738, 630 N.E. 2d 998 (1994)] asked the question whether a seventh shipment of a single commodity ordered during a month in which a pre-existing written contract calls for only six shipments is sold under the pre-existing contract or a different contract. Neither did either opinion reach the holding Schmieding would need to make its case on this point—namely, that where a pre-existing contract calls for six shipments during a month, without specifying dates, and the buyer orders seven shipments, the order for the seventh shipment renders all of the shipments received during that month shipments received under separate contracts. The November 11, 2015 load of celery was the fourth load received during November, not the seventh. . . .

ECF# 87, pp. 28-29. For its evidence on this point, Reser's relies principally

on the affidavit of its Chief Financial officer, Paul Leavy, which states at ¶¶ 5

and 6 that:

5. As shown by Exhibit 2, the load of celery received by Reser's Topeka facility on November 11, 2015, was the fourth load of celery received that month from H.C. Schmieding Produce Co., LLC ("Schmieding"). The previous loads were received on November 2, 4 and 9.
6. As shown by Exhibit 2, the load of celery received by Reser's Topeka facility on November 11, 2015, was the 77th of 91 loads of celery called for under the February 19, 2015, Contract of Sale between Reser's and Schmieding, 76 loads having previously been received during the contract period.

ECF# 87-2, p. 2. As CFO Leavy avers, Exhibit 2 is a table prepared by

Reser's to "reflect the number of celery loads Reser's received from

Schmieding pursuant to the February 19, 2015, Contract for Sale." *Id.* ¶ 4.

Simply put, Reser's argues that #133505 is part of the 91 loads under the

2015 Celery Contract because it was the fourth load of celery delivered in

November and it was the 77th load of celery delivered during the contract

year. Other than the timing of when the invoiced load #133505 was

delivered and CFO Leavy's related conclusory statements that the load was

therefore part of the 2015 Celery Contract, Reser's offers no other facts to

refute Schmieding's position that #133505 was for a load of celery

separately contracted and was not part of the 2015 Celery Contract.

In reply, Schmieding submits the affidavit of Gary Owens who

has been its sales manager on Reser's account for approximately 20 years

and is the sales manager who handled all the transactions involved in this

action. ECF# 92-5. In his affidavit, Owens explains that Schmieding does not

grow its own celery but contracts with growers to supply a volume of celery

that will meet Schmieding's customers' needs for celery as scheduled in the

customer contracts. So, when a customer wants more celery than has been

scheduled in a contract, Schmieding's growers/suppliers may be unable to

supply the additional celery. Owens further avers that Reser's sent two

purchase orders for celery to be delivered on November 9 and 11, 2015,

which meant that with the two loads already delivered in November, Reser's

would be receiving two-thirds of its contract loads within the first part of

November. Owens informed Dean Bowhay[3] of Reser's that Schmieding's could not fill the purchase order for November 11th as the contract celery supplier could not provide this much celery so early in November. Bowhay told Owens to look on the open market to fill this order. Owens avers:

> 9. My supplier at Sunterra Produce Traders, Inc. ("Sunterra") told me that he could get a load of celery from C & E Farms, Inc. ("C&E"), but that it was "long stalk celery," a different variety from the kind Schmieding supplied under the Contract. I had never sold this type of celery before, so I called Bowhay to see if he would be interested. Bowhay told me he was familiar with this variety of celery and that it was acceptable. We discussed open market pricing, and Bowhay instructed me to ship the load at an agreed off-contract price. I modified the second purchase order, changing the contract price from $26.50 to $38.00 and noting "change to per Dean [Bowhay] open mkt load," and faxed the modified purchase order to Justin Elmore, Reser's buyer. Reser's never disputed the revised terms of the purchase order. A copy of the modified purchase order I faxed to Elmore was included in Schmieding's motion papers as Exhibit J. [ECF# 76-10].
> 10. C&E loaded the celery on November 7 and we delivered it to Reser's on November 11, 2015. The load arrived and was unloaded without any issues and we issued invoice 133505 at the off-contract price of $38.00 per unit. Reser's never disputed the invoice. . . .
> 11. During the term of the Contract, Schmieding shipped 96 loads of celery to Reser's—five more than were called for under the Contract. Reser's has paid for four of the off-contract loads, and is withholding payment only for the off-contract load that is at issue in this lawsuit. . . . Notably, invoice 133505 was for $38.00 per hundredweight, far more than Contract pricing for November.

ECF# 92-5, pp. 5-6. Schmieding did not come forward with this affidavit until it was attached to its reply memorandum, but it was offered in response to Reser's position that invoice #133505 was part of the 2015 Celery Contract based on the timing of the purchase order and delivery.

---

[3] Bowhay's name appears on the 2015 Celery Contract as the signing representative on behalf of Reser's. ECF# 76-8, p. 2.

ECF#92. It is noteworthy that Reser's has not sought to leave to file a sur-reply to address the specifics of Owens' affidavit concerning invoice #133505.

Reser's bears the burden of establishing its authority to set-off its damages from invoice #133505 against the payments owed for installment deliveries under the 2015 Celery Contract. *See AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 950 (9th Cir. 2006). Thus, it falls on Reser's to demonstrate there is a genuine issue of material fact that might affect the outcome of a trial on its defense of setoff. As noted above, Reser's efforts rely principally on CFO Leavy's affidavit which offers no more than conclusions based exclusively on the timing of invoice #133505. Evidence of timing alone is not a significant factor under all the circumstances to create a "genuine" factual dispute over whether invoice #133505 is part of the 2015 Celery Contract. First, the 2015 Celery Contract is not drafted to cover all loads of celery sold during a period of time. Instead of encompassing all loads of celery that happen to be delivered over a period of time, it specifically addresses only the 91 contracted loads.[4]

---

[4] The 2015 contract provides:

> It is understood and agreed that in the event the crop or crops of celery being grown and/or contracted for by the Seller and from which Seller is to supply Buyer under this Agreement, hereafter "contract celery," does not produce sufficient quantity of celery to fulfill terms of his written Agreement, Seller shall then prorate such supplies as he has available to him from the contract celery among his contract

Second, the celery price on invoice #133505 is much higher than the price of celery set by the 2015 Celery Contract for the six loads of celery to be delivered in November. Third, the purchase order #838903 associated with invoice #133505 bears handwritten terms indicating the price was a separate arrangement based on the open market. Fourth, the 2015 Celery Contract does not obligate the sale and delivery of celery loads beyond the 91 called for in the contract, and it does not have terms that address the delivery, origin, or price of additional loads of celery beyond the 91 contracted. The mere fact that the invoice #133505 was negotiated and performed during the life of the 2015 Celery Contract does not make it a part of the same contract. *See Cliffstar Corp. v. Riverbend Products, Inc.*, 750 F. Supp. 81, 89 (W.D.N.Y. 1990). As the official UCC comment to Ark. Code Ann. § 4-2-717 states, the setoff provision is not applicable unless the breach involves the "same contract under which the price in question is claimed to have been earned." This is the not case here.

From these circumstances alone, the court can find no genuine factual dispute that invoice #133505 is a separate contract of purchase for

---

customers and Buyer shall receive his pro rata share thereof, which will fully discharge Seller's obligation under this agreement.

ECF# 76-8, p. 3. Thus, the celery to be supplied under the 2015 Celery Contract is the "contract celery" described as one of the 91 truckloads of U.S. #1 celery to be delivered during the shipment period and subject to the price specified in the attached 2015 Celery Contract Schedule details per month the number of loads, the state of origin, and the delivered price. ECF #76-8, p. 4.

an additional load of celery based on a separately arranged price and acquired on the open market. All of these circumstances are evident from the documents originally submitted in support of Schmieding's summary judgment motion. The affidavit of Schmieding's sales manager, Gary Owens, explains away any possible significance in the timing of invoice #133505. Reser's has chosen not to contest Owens' explanation. For all these reasons, the court concludes that Reser's has not come forward with a genuine issue of material fact on its setoff defense as to avoid summary judgment for its liability under PACA and breach of contract in failing to pay Schmieding for the loads of celery delivered under the 2015 Celery Contract. Of course, this holding does not preclude Reser's from going forward with its setoff defense against its debt under the separate contract in invoice #133505.

**DAMAGES, INTEREST AND ATTORNEYS' FEES**

Schmieding moves for summary judgment on the principal amount of $276,862.39, plus accrued interest at the rate of 18% per annum through May 16, 2017, (the date of its motion),  and continuing thereafter until paid in full, plus attorney's fees in the amount of $62,149.94 for a final judgment against Reser's in the amount of $408,627.44. ECF# 76, p. 9-10. Schmieding sets forth the damage, interest and fee totals in its statement of uncontroverted facts and supports them with invoices, schedules, attorney fee statements, and the declaration of Gregory Brown. *Id.* at pp. 9-10, ¶ 16. In saying it controverts this statement of fact, Reser's denies its liability

because of its losses from invoice #133505, but it does not controvert any of the totals as calculated and admits, "the only way Schmieding would be entitled to interest and attorney fees from Reser's would be if it is determined that Reser's is obligated to pay the amount [of] Schmieding claims." ECF#87, p. 7, ¶ 16.

Schmieding's damage (invoice amounts), interest and fee totals are calculated in its Exhibit M, (ECF# 76-13, p.2). This exhibit, however, includes invoice #133505 in the amount due and interested owed. Because Reser's has avoided summary judgment on its setoff defense against its debt for the separate contract of invoice #133505, the court cannot make a final determination for an award of damages, interest and attorney's fees. The court does hereby find that Reser's has failed to controvert the invoice amounts and the interest due on those amounts for the 24 loads under the 2015 Celery Contract and has failed to controvert Schmieding's reasonable attorneys' fees to date.

IT IS THEREFORE ORDERED that Schmieding's motion for summary judgment (ECF# 75) is granted insofar as it is determined as a matter of law that Reser's may not setoff under § 2-717 any of its losses related to invoice #133505 against its liability for the 24 loads under the 2015 Celery Contract and that Reser's is liable for the invoice amounts, interest and fee totals as calculated in Exhibit M for these 24 loads, but

Schmieding's motion is denied insofar as Reser's use of the setoff against its liability for invoice #133505.

Dated this 15th day of September, 2017 at Topeka, Kansas.


s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge